## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| v. | ) | **Criminal Action No. 11-36 (RMC)** |
| | ) | |
| **Y.A., Juvenile Male,** | ) | |
| | ) | ~~UNDER SEAL~~-- |
| **Defendant.** | ) | |
| | ) | |

### OPINION

      Y.A., the defendant in this case, is a young man, now twenty-one years old, who allegedly committed two murders at age seventeen as part of his membership in the transnational gang MS-13. Y.A. is currently charged and treated as a juvenile; for almost two years, this case has proceeded under seal, and Y.A. has been protected by special, modified court procedures to accommodate his unique status as a youth charged in federal court with gravely serious crimes. The question presently before the Court is whether Y.A. should be treated as an adult, subject to federal criminal prosecution through a public process, with the special juvenile safeguards removed. The stakes are high; if convicted of all pending charges as an adult criminal, Y.A. faces a lifetime of imprisonment, but he could be detained until only age twenty-six if adjudicated responsible as a juvenile. The Court has weighed all of the relevant factors and concludes that the interest of justice requires transfer of Y.A. to adult criminal prosecution. The Court announced its ruling orally on February 7, 2013, after an evidentiary hearing, but immediately stayed its effect pending a possible interlocutory appeal. This opinion provides the underlying analysis of the facts and law.

## I. FACTS

Federal juvenile delinquency proceedings such as this one are relatively uncommon, and this case has, in its time before this Court, involved an above-average number of complexities. The Court reviews the case's complicated procedural history first to set the stage for its factual findings regarding Y.A. and the offenses with which he is charged.

### A. Procedural History

Y.A. is charged by Amended Juvenile Information, Dkt. 27, with five counts: Count I, conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d) (conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act (RICO), referred to as "RICO Conspiracy"); Counts II and IV, murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Violent Crime in Aid of Racketeering, referred to as "VICAR"); Counts III and V, first-degree murder while armed, in violation of D.C. Code § 22-2101. Counts II and III involve the murder of Louis Alberto Membreno-Zelaya, which occurred on November 6, 2008. Counts IV and V involve the murder of Giovanni Sanchez (also spelled Geovany or Giovanny in the record), which occurred on December 12, 2008. All charges stem from Y.A.'s alleged involvement with MS-13, which the government describes as follows:

> *La Mara Salvatrucha*, also known as the MS-13 gang (hereafter "MS-13"), is a gang composed primarily of immigrants or descendants of immigrants from El Salvador, with members operating throughout the United States, including within the District of Columbia. The name *"Mara Salvatrucha"* is a combination of several slang terms. The word *"Mara"* is the term used in El Salvador for "gang." The phrase *"Salvatrucha"* is a combination of the words *"Salva,"* which is an abbreviation for "Salvadoran," and *"trucha,"* which is a slang term for the warning "fear us," "look out," or "heads up."
>
> . . .
>
> MS-13 is a national and international criminal organization with over 10,000 members regularly conducting gang activities in at

2

least twenty states and the District of Columbia, as well as in
Mexico, Honduras, Guatemala, and El Salvador. MS-13 is one of
the largest street gangs in the United States. Gang members
actively recruit members, including juveniles, from communities
with a large number of immigrants from El Salvador. Members,
however, can also have ethnic heritage from other Central
American countries. In the United States, MS-13 has been
functioning since at least the 1980s.

. . .

[M]embers of MS-13 were expected to protect the name,
reputation, and status of the gang from rival gang members and
other persons. MS-13 members required that all individuals should
show respect and deference to the gang and its membership. To
protect the gang and to enhance its reputation, MS-13 members
were expected to use any means necessary to force respect from
those who show disrespect, including acts of intimidation and
violence. MS-13's creed is exemplified by one of its mottos,
"Matar, robar, violar, controlar," which translates in sum and
substance to, "Kill, steal, rape, control."

. . .

MS-13 members were required to commit acts of violence to
maintain membership and discipline within the gang, including
violence against rival gang members or those they perceived to be
rival gang members, as well as MS-13 members and associates
who violated the gang's rules. As a result of MS-13's frequent use
of violence, innocent persons were often injured or killed.
Participation in criminal activity by an MS-13 member,
particularly violent acts directed at rival gang members or as
ordered by the gang leadership, increased the level of respect
accorded that member, resulting in that member maintaining or
increasing his position in the gang, and possibly resulting in
recognition as a leader

Am. Juvenile Information ¶¶ 1, 3, 6–7.

The offenses Y.A. allegedly committed are related to a separate criminal

proceeding before this Court involving nineteen alleged MS-13 members, *United States v.
Carlos Silva et al.*, 10-cr-256 (RMC). For example, Hector Diaz-Flores, named as having

participated with Y.A. in the Sanchez murder, Am. Juvenile Information ¶ 22(f), is one of the

3

defendants in the *Silva* case. The government asserts that Y.A. was part of the leadership of a "clique"—a subgroup—of MS-13. *See* Memo. Op. dated June 24, 2011 [Dkt. 25] at 2.

Y.A. was indicted for first-degree murder and related charges for the Sanchez stabbing in the Superior Court of the District of Columbia in cases 2008 CF1 29100 and 2008 CF1 29102. The United States Attorney directly filed a murder indictment against Y.A. which, under D.C. Code § 16-2301(3), removed Y.A. from the definition of a juvenile for purposes of local prosecution and set him to be tried as an adult. Although a trial was scheduled in Superior Court, it was continued when the United States Attorney filed a Juvenile Information in this Court on February 9, 2011, *see* [Dkt. 2], charging Y.A. with additional acts which, if committed by an adult, would constitute the federal offense of VICAR. The Attorney General's certification, required in these cases by the Federal Juvenile Delinquency Act (FJDA), 18 U.S.C. § 5032 ¶ 1,[1] was filed shortly thereafter. *See* Gov't Cert. [Dkt. 4].

The government originally sought federal adult criminal prosecution of Y.A. as a mandatory matter on the basis of his prior juvenile adjudications.[2] *See* Gov't Mot. Mandatory Transfer [Dkt. 3]. A full recital of the law governing mandatory transfer is not germane here. It suffices to summarize that, given the offenses charged in this case and Y.A.'s juvenile records at the time this case was filed, mandatory transfer hinged on Y.A.'s ▮

▮ Through attorneys from the

D.C. Public Defender Service ("PDS") who had been appointed to represent him in Superior

---

[1] 18 U.S.C. § 5032, the applicable statute, is lengthy and contains no subsections. The Court thus refers to specific paragraphs of that section by number in the order they appear in the United States Code.

[2] In juvenile proceedings, the correct terminology is that a juvenile is *adjudicated delinquent* instead of being convicted of a crime. *See, e.g.*, *United States v. Chambers*, 944 F.2d 1253, 1257 (6th Cir. 1991).

Court, Y.A. opposed the government's mandatory-transfer motion in federal court. After a
hearing and extended argument on May 10, 2011, the Court issued an opinion and order on June
24, 2011, granting mandatory transfer of Y.A. to adult criminal prosecution. That order provided
that the case would remain sealed for thirty days as protection for Y.A. in case of an appeal. *See*
[Dkt. 26]. On Y.A.'s motion, the Court extended the time to file an interlocutory appeal, *see*
Order [Dkt. 32], which he ultimately did on August 5, 2011, *see* [Dkt. 34]. Mandatory transfer
was stayed pending appeal. *See* Order [Dkt. 36]. Because the government filed a superseding
juvenile information, it also filed an amended motion for mandatory transfer, [Dkt. 28]; because
the new information did not affect the legal analysis of the transfer, which turned on Y.A.'s prior
record, the Court granted the amended motion and stayed it. *See* Order [Dkt. 37].

　　　　　While the appeal was pending without briefing before the D.C. Circuit, Y.A.'s
PDS counsel filed a motion in D.C. Superior Court to

*See* Mot. Reconsid., Ex. A [Dkt. 39-1]. The prosecuting authority in that forum, the
D.C. Office of the Attorney General, did not oppose the motion. *See id.* The Superior Court
judge thus granted the motion, and Y.A. e

on October 6, 2011. *See id.*, Ex. B [Dkt. 39-2]. Shortly thereafter, Y.A. voluntarily dismissed
his D.C. Circuit appeal and filed a motion for reconsideration of the mandatory transfer order,
arguing that he could not be tried as an adult once the predicate

vacated. *See id.* [Dkt. 39]. The government vehemently opposed the motion for reconsideration,
asserting that Y.A.'s prior counsel had "attempt[ed] to undermine the basis of this Court's
determination that federal law required" adult criminal prosecution by "fail[ing] to notice the
[Superior C]ourt and the Office of the Attorney General of the decision of this Court . . . and to
accurately report . . . the charges pending against defendant in this court." Gov't Opp. [Dkt. 51]

5

at 1–2. Y.A. changed counsel in October 2012; his present counsel was not involved in any prior proceedings in either Superior Court or this Court.

On November 29, 2012, the Court granted Y.A.'s motion for reconsideration, concluding that without the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ here was no statutory basis for mandatory federal adult criminal prosecution. *See* Order [Dkt. 68].[3] Undeterred, the government filed a motion for permissive transfer of Y.A. to adult criminal prosecution on December 13, 2012. *See* [Dkt. 60]. Y.A. opposed the motion, *see* [Dkt. 69], and the Court held an evidentiary hearing and heard oral argument on February 7, 2013.[4] The parties also provided the Court with a Joint Hearing Statement, Dkt. 71, and Joint Stipulations, Dkt. 72; both of those filings and all of the attached exhibits were made part of the record for consideration of the government's motion for permissive transfer.

Each party called two witnesses at the evidentiary hearing. The government's witnesses were Metropolitan Police Department Detective Grade One Bryan Kasul, who conducted an interview with Y.A. on December 12 or 13, 2008, regarding the Sanchez murder, and Special Agent James Brumbelow. Agent Brumbelow is the lead investigator in the *Silva* case, and he participated in an interview with Y.A. in July 2012. Y.A. presented the testimony of Dr. Gregory DeClue, a forensic psychologist who performed a number of tests on Y.A. at his prior counsel's request. Marina Mendoza, Y.A.'s mother, was present throughout the hearing and also testified.

At the conclusion of the hearing, the Court granted the government's motion for permissive transfer and briefly explained its reasoning from the bench. *See* Order dated Feb. 7,

---

[3] The Court's original order dated November 29, 2012 was replaced by an amended order dated January 8, 2013.

[4] This Opinion is written without the benefit of the hearing transcript to expedite its issuance.

2013 [Dkt. 74]. Y.A.'s counsel stated that Y.A. wished to file an interlocutory appeal, so the

Court stayed the order and directed that this case remain under seal pending a ruling from the

D.C. Circuit on Y.A.'s appeal. At the parties' request, the Court writes now to memorialize its

findings and explain its reasoning.

### B. Findings of Fact

Before turning to its findings of fact from the February 7, 2013, evidentiary

hearing, the Court first reviews the parties' joint stipulations and documentation. The parties

have helpfully categorized some of the agreed-upon information according to the statutory

factors the Court is required to consider in ruling on the government's motion—"[1] the age and

social background of the juvenile; [2] the nature of the alleged offense; [3] the extent and nature

of the juvenile's prior delinquency record; [4] the juvenile's present intellectual development and

psychological maturity; [5] the nature of past treatment efforts and the juvenile's response to

such efforts; [and 6] the availability of programs designed to treat the juvenile's behavioral

problems." *See* 18 U.S.C. § 5032 ¶ 5.

### 1. Parties' Stipulations

The parties' stipulations are taken directly from their Joint Stipulations in Dkt. 72

with only minor typographical and stylistic alterations. These stipulations are only effective for

the present proceedings and do not bind the parties at trial.

1.    Age and Social Background:

a.    Y.A.'s date of birth is April 28, 1991. At the time of the transfer hearing,

he was twenty-one years and nine months of age. At the time of the November 6, 2008 murder

alleged in the information, he was seventeen years and six months; at the time of the December

12, 2008 murder alleged in the information he was seventeen years and seven months.

7

b.      Y.A. is a native of Honduras and lived there until he was approximately

fourteen years old. His mother was a college graduate in Honduras who immigrated to the

United States. Y.A. was brought to the United States with the assistance of a "coyote"[5]; the trip

included an arduous trek through the desert. Once in the United States, Y.A. attended school,

where he was subjected to some harassment and abuse as a result of being an immigrant. He

joined MS-13 just before he dropped out of school in early 2008.

2.      Nature of the Offense: Y.A. is charged with two counts of Murder in Aid of

Racketeering pursuant to 18 U.S.C. § 1959 and one count of RICO conspiracy pursuant to 18

U.S.C. § 1962(d). The government alleges the following facts: On November 6, 2008, the

defendant was aware that a "green light," or authorization to kill, had been issued for the victim.

The night of the murder, the defendant, along with several other MS-13 members, accosted the

victim and stabbed him more than 20 times, resulting in his death. The government alleges that

Y.A. was one of the stabbers. With regard to the December 12, 2008, murder, the government

alleges that Y.A., along with other MS-13 members, chased the victim and assaulted him

because they believed he was a rival gang member. The defendant was the lone stabber, striking

the victim at least ten times.

3.      Prior Juvenile Delinquency Findings: The Court may take judicial notice of

documents filed with the Court, including the Notice of Juvenile Record [Dkt. 15] and the

Defendant's Motion for Reconsideration [Dkt. 39]. The records of the Family Division of

Superior Court, Jt. Stips. Ex., Dkt. 72-1, are authentic and may be considered by the Court.

---

[5] A coyote is "a person who smuggles illegal immigrants into the United States for a fee."
*United States v. Hernandez-Bautista*, 293 F.3d 845, 850 (5th Cir. 2002).

8

4. _Present Intellectual Development and Psychological Maturity_: Y.A. has been

incarcerated since on or about December 16, 2008. Since that time he successfully completed

the requirements to obtain his GED.

5. _Past Treatment Efforts and Response_: Y.A. was placed

Family Division of Superior Court in March 2008. He had a

He was

6. _Availability of Programs to Treat the Offender as a Juvenile_: Pursuant to District

of Columbia law, Y.A. is considered an adult and is not eligible for juvenile services. Because

Y.A. is over the age of 21, he would be housed in an adult facility in BOP, and no juvenile

services would be afforded to him. He is likely to be eligible for programs offered to adults in

BOP. Because he is likely to be deported upon release from BOP, he is unlikely to receive

services through supervised release.

## 2. Court's Findings of Fact

The Court makes the following findings of fact based on the parties' exhibits and

the testimony presented on February 7, 2013.

7. The Court takes judicial notice of Y.A.'s prior juvenile delinquency record as

follows:

9



8.      On either December 12 or 13, 2008, Detective Bryan Kasul and Detective

Sergeant Dan Wagner of the Metropolitan Police Department (MPD) interviewed Y.A., who was

at the MPD investigative unit for approximately seven and a half hours. At the time of the

interview, Y.A. was seventeen years and seven months old. The video of the entire interview is

part of the record as Government Hearing Exhibit One and was reviewed by the Court. During

the first two and a half hours, Y.A. was alone and slept. The detectives spoke with him for most

of the rest of the time, with some breaks. Y.A. was repeatedly told that he was not under arrest,

was free to leave, and would be given a ride home if he wished to stop the interview, but he did

not ask to leave. Detective Kasul, who had worked in homicide for twelve years as of 2008 and

has interviewed many subjects, including approximately 200 persons aged sixteen to eighteen,

described Y.A.'s demeanor as "typical" and "consistent" with others in his peer group.

Detective Kasul believed Y.A. was initially trying to be deceptive, evidenced by slouching and

not making eye contact, but when the officers asked him to sit up and look up, "he responded."

Y.A.'s answers were generally responsive, and he understood English. At times, he had

difficulty understanding isolated words, but the officers recognized those moments and repeated

or rephrased the concept. Near the end of the interview, in which Y.A. admitted involvement in

the Sanchez stabbing and stated that he stabbed the victim "two or three" times in the torso, Y.A.

requested that the police allow him to go home to his family for the rest of the year before

arresting him.

11

9.      Special Agent Jason Brumbelow has been an agent with Homeland Security

Investigations since early 2008 and is the lead agent in the RICO investigation of Carlos Silva

and his associates, although he was not involved in either murder investigation regarding Y.A.

Agent Brumbelow has conducted many interviews with persons aged seventeen to twenty-one.

He was present at a July 2012 meeting with Y.A., Y.A.'s PDS attorneys, prosecutors, and a

translator. The participants discussed whether Y.A. would enter a guilty plea; one prosecutor did

most of the talking, but Y.A. had opportunities to respond. In Agent Brumbelow's estimation,

Y.A.'s answers were responsive. Y.A. was "attentive" and "quiet" and listened to the

prosecutors, and he appeared to Agent Brumbelow to be "in the norm" with his peer group.

Agent Brumbelow did not observe anything that made him think Y.A. was less mature than other

members of his age group, but one question Y.A. asked—whether "there was a way he could get

a better deal"—stood out to the agent as demonstrating Y.A.'s understanding of the judicial

process.

10.     Testimony of Dr. Gregory DeClue: Without objection from the government, the

Court permitted Y.A.'s expert, Dr. Gregory DeClue, to offer expert testimony in the fields of

forensic psychology and intelligence quotient (IQ) testing and interpretation.

        a.      Dr. Gregory DeClue is a forensic psychologist who has been licensed as a

psychologist in Florida since 1984. He holds a PhD from the University of Missouri in

counseling. He has focused his practice on forensic psychology since 1990, which means most

of his work involves applying science and psychology to the law. He often testifies in court and

sometimes works with law enforcement. He has been permitted to offer expert testimony in the

District of Columbia courts approximately three times. Dr. DeClue has performed and

interpreted hundreds of IQ tests.

b.     Dr. DeClue conducted an evaluation of Y.A. at his prior counsel's behest on December 9, 2010. His report, dated July 5, 2011, was accepted into evidence without objection as Defendant's Hearing Exhibit 1; it also appears in the record as an exhibit to the Joint Hearing Statement at Dkt. 71-1, pages 8–12 ("DeClue Report"). Although the report is denoted "work product," the parties agreed that the Court should consider it, and any privilege is deemed waived for the purposes of the permissive transfer proceeding.

c.     Dr. DeClue conducted the testing of Y.A. in a detention facility in the District of Columbia. His evaluation took about an hour and included several subtests, including an IQ test, a test of memory malingering, and a suggestability test. The testing was performed in English. Dr. DeClue had "no difficulty" communicating with Y.A. in English.

d.     The IQ test performed by Dr. DeClue is a standardized test, the Weschler Adult Intelligence Scale Test Fourth Edition, commonly referred to as "WAIS-IV." The fourth edition remains the current edition, is the most widely used IQ test, and is "well accepted by psychologists." IQ tests are comprised of subtests that show individual differences in a person's mental abilities. The composite score is referred to as a person's IQ, which is roughly a measure of a person's intelligence. Although Y.A.'s counsel asked whether psychological professionals have criticized the WAIS-IV as biased towards academic intelligence, Dr. DeClue disagreed and testified that he was neither aware of such criticism nor would he believe it to be valid.

e.     Dr. DeClue opined that Y.A. was "giving his full effort" during the WAIS-IV, as measured by the Test of Memory Malingering ("TOMM") subtest. In Dr. DeClue's experience, sometimes subjects do not give full effort, which is referred to as "faking bad"; that was not the case with Y.A., whose scores were "*not* similar to those of people feigning cognitive impairment."

13

f.    Y.A.'s scores on the WAIS-IV were as follows: verbal comprehension, 80
(ninth percentile); perceptual reasoning, 82 (twelfth percentile); working memory, 86 (eighteenth
percentile); processing speed, 76 (fifth percentile); full scale IQ, 77 (sixth percentile). In Dr.
DeClue's opinion, a full scale IQ of 77 represents "borderline intellectual functioning," meaning
that Y.A.'s intelligence is "well below average." The average is 100, while the cutoff for mental
disability or mental retardation is 70.

g.    Dr. DeClue opined at length about whether Y.A.'s IQ test scores would
change if the test were administered in Spanish. Although the WAIS-IV is available in some
different languages and there are some IQ tests designed for primary Spanish speakers, Dr.
DeClue stated that conducting the test in English did not affect the validity of the results. Use of
English was apt because Dr. DeClue was performing the test at PDS counsel's direction to
determine how Y.A. had responded during the interview with police, which was conducted in
English. Y.A. understood all of Dr. DeClue's instructions in English.

h.    According to Dr. DeClue, although IQ tests are designed to be not
dependent on the subject's culture and language, they "inevitably do have some cultural
components." Administering IQ tests in both English and Spanish would be ideal to get the most
precise understanding of Y.A.'s intelligence. However, in Y.A.'s case, Dr. DeClue testified that
he "did not find a pattern where every time the subtest had a lot of language to it, [Y.A.] would
get lower scores." Dr. DeClue reasoned that only some parts of the WAIS-IV have verbal
components—for example, a verbal comprehension score might rise in a subject's native
language versus a second language, but a perceptual reasoning score might not. This means that,
in Dr. DeClue's opinion, had the test been administered in Spanish, Y.A.'s score might increase
slightly—possibly to the low 80s—but would unlikely be very different.

14

i.      According to Dr. DeClue's evaluation, in December 2010, Y.A.'s reading

skills were at a fourth- or fifth-grade level, while his listening comprehension, oral language, and

oral expression skills were at a first- or second-grade level. DeClue Report at 2–3.

j.      Dr. DeClue's evaluation included tests for whether Y.A. understood and

appreciated *Miranda*[6] warnings. Y.A.'s scores were as follows: Comprehension of *Miranda*

warnings, 8 of 8 ("showed the ability to explain (paraphrase) the Miranda rights in a meaningful

way"); Comprehension of *Miranda* Rights Recognition, 8 of 12 ("assess[ing] an examinee's

understanding of each *Miranda* warning by his or her ability to recognize whether or not the

particular pre-constructed sentence has the same meaning as the *Miranda* warning statement");

Comprehension of *Miranda* vocabulary, 6 of 12 (understood "attorney" and "interrogation,"

partially understood "consult" and "right," did not understand "appoint" or "entitled"); Function

of Rights in Interrogation, 15 of 30 ("some understanding of how the *Miranda* rights apply in

some realistic scenarios, but he showed some significant misunderstandings"). DeClue Report at

3–4.

k.      In a suggestibility test, Y.A. "did not score higher on interrogative

suggestibility than the average person does." DeClue Report at 5.

11.     Y.A.'s Mother's Testimony About Y.A.'s Background: Y.A.'s mother, Marina

Mendoza, was present throughout the hearing and provided testimony. Ms. Mendoza was given

a headset so that she could hear the simultaneous English-to-Spanish translation. Ms. Mendoza

testified in Spanish that was translated by the court interpreter.

a.      Ms. Mendoza is fifty-two years old and was born in Honduras, where she

lived until 1998. In Honduras, Ms. Mendoza worked as an elementary school teacher for

---

[6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

approximately fifteen years. She had two children—Y.A. and a daughter who is approximately
two years younger than Y.A.

        b.     Ms. Mendoza and Y.A.'s father were never married, but they lived
together for approximately five years. Y.A.'s father left the family when Y.A. was about five
years old, and after that, he rarely visited. This had a great effect on Y.A., who missed his father
significantly and was often upset.

        c.     In 1998, when Y.A. was about six years old, Ms. Mendoza came to the
United States. She left Y.A. and his sister in Honduras with Y.A.'s grandmother, aunt, and a
babysitter. Y.A. came to the United States illegally at age fourteen or fifteen along with
unidentified persons; the journey took about two weeks.

        d.     Y.A. initially had difficulty adjusting to life in the United States. At first,
he had a hard time getting to know new people, making friends, and learning English.

        e.     In his first few weeks in school, Y.A. had trouble with his classmates. On
one occasion, he was attacked by unidentified persons who waited for him to get off the bus; Ms.
Mendoza was unsure if the persons were in a gang. They struck him and beat him with a traffic
cone. Y.A. was brought home unconscious, and Ms. Mendoza took him to the hospital.

        f.     Ms. Mendoza was unaware of any other attacks on Y.A., but she knew he
was involved in a fight at school on one occasion.

## II. ANALYSIS

        The Court addresses threshold procedural matters before turning to its analysis of
permissive transfer of Y.A. to adult criminal prosecution.

### A. Preliminary Procedural Matters

        The FJDA interposes a number of procedural prerequisites in federal juvenile
delinquency proceedings to account for the unique nature of such cases. *See United States v.*

16

*Thomas*, 114 F.3d 228, 263 (D.C. Cir. 1997) (noting that alleged juvenile delinquents "receive special rights and immunities, are shielded from publicity, are confined apart from adult criminals and are protected from certain consequences of adult conviction").

### 1. Jurisdiction and Attorney General Certification

The first such requirement is receipt of the Attorney General's certification. "A juvenile . . . shall not be proceeded against . . . unless the Attorney General, after investigation, certifies . . . that . . . [1] the offense charged is a crime of violence that is a felony . . . and [2] that there is a substantial federal interest in the case or that offense to warrant the exercise of federal jurisdiction." 18 U.S.C. § 5032 ¶ 1. The Court's subject matter jurisdiction depends upon the filing of a proper certification pursuant to § 5032. *In re Sealed Case (Juvenile Transfer)*, 131 F.3d 208, 211 (D.C. Cir. 1997) (noting that certification by the Attorney General has been "uniformly treated . . . as jurisdictional" by federal circuit courts of appeals). On this question, the D.C. Circuit adopted the "convincing analysis," *id.*, of *United States v. Chambers*, 944 F.2d 1253 (6th Cir. 1991), to the following effect:

> [U]nder the Federal Juvenile Delinquency Act, Congress "revoked the district courts' preexisting, largely unrestricted subject-matter jurisdiction over criminal prosecutions against juveniles," by declaring that acts otherwise criminal, when committed by juveniles, become generally noncriminal and merely constitute the entry into a state of "juvenile delinquency." [*Chambers*,] 944 F.2d at 1258. Thus, a juvenile who has committed what otherwise "*would have been a crime* if committed by an adult," 18 U.S.C. § 5031 (emphasis added), has not committed a criminal offense against the United States and is therefore not within the criminal jurisdiction of the federal courts. Then, as the Sixth Circuit went on to note, Congress "partially restored" the jurisdiction it had taken away from the courts by conferring authority to proceed against juveniles alleged to have committed "acts that would be federal crimes if committed by adults," *id.* at 1259, when, but *only* when, the certification requirement is met. Therefore, the Sixth Circuit reasoned cogently, this certification must be a jurisdictional requirement. As it does go to the subject-matter jurisdiction of the

17

> court, we must answer that question before we can legitimately
> opine on anything else.

*In re Sealed Case*, 131 F.3d at 211.

Furthermore, this Circuit has held that there is no "presumption of reviewability" that applies to the Attorney General's certification. *Id.* at 214 (distinguishing finding in *United States v. Juvenile Male # 1*, 86 F.3d 1314 (4th Cir. 1996)). "The decision to invoke the power of the federal government and the criminal jurisdiction of federal courts rests peculiarly within the province of the Executive." *In re Sealed Case*, 131 F.3d at 214. "The decision to certify that a particular case involves a 'substantial federal interest' implicates the core prosecutorial discretion vested in the Attorney General and [his] delegates." *Id.* "Thus, we review the certification only to determine its presence and whether it facially supports our jurisdiction." *Id.* at 215.

The United States Attorney for the District of Columbia submitted a certification of jurisdiction on the same day that the Information was filed. *See* Gov't Cert. [Dkt. 4]. The certification asserts that jurisdiction is proper pursuant to § 5032 because Y.A. is charged with committing acts as a juvenile that would constitute a felony crime of violence if committed by an adult and a substantial federal interest exists due to the nature of the offense, i.e., Y.A.'s alleged involvement in a racketeering enterprise, the MS-13 gang, and the commission of offenses on behalf of said enterprise. *See id.* Because the certification facially supports this Court's jurisdiction pursuant to the FJDA, this Court has jurisdiction over Y.A.

### 2. Receipt of Juvenile Court Records

The juvenile cannot be transferred until the Court has received "any prior juvenile court records." 18 U.S.C. § 5032 ¶ 10; *see also United States v. David A.*, 436 F.3d 1201, 1209–10 (10th Cir. 2006). This requirement is satisfied; the Court has received Y.A.'s juvenile court

18

records. *See* [Dkt. 13, 15]. As Y.A.'s prior record was the subject of significant litigation in this
case, the Court is well aware of those records and the alterations made thereto in the fall of 2011.
*See* Updated Juvenile Records, Mot. Reconsideration, Exs. [Dkt. 39-1, 39-2].

### 3. Evidentiary and Procedural Considerations for Transfer Hearing

The Court is required to hold a hearing before transferring a juvenile to adult
criminal prosecution. *See* 18 U.S.C. § 5032 ¶ 4. The transfer proceeding "must 'measure up to
the essentials of due process and fair treatment'" because it is a "'critically important action
determining vitally important statutory rights of the juvenile.'" *United States v. E.K.*, 471 F.
Supp. 924, 930 (D. Or. 1979) (quoting *Kent v. United States*, 383 U.S. 541, 554 (1966)).
"Reasonable notice" of the transfer hearing must be given "to the juvenile, his parents, guardian,
or custodian, and to his counsel." 18 U.S.C. § 5032 ¶ 6. The juvenile has a right to counsel at
the transfer hearing. *Id.*

Transfer hearings "are analogous to preliminary examinations in criminal cases,
and thus . . . the Federal Rules of Evidence (including the hearsay rule) do not apply except with
respect to privileges." *United States v. SLW*, 406 F.3d 991, 995 (8th Cir. 2005) (citing, *inter
alia*, *Gov't of Virgin Islands in Interest of A.M.*, 34 F.3d 153, 161–62 (3d Cir. 1994)); *see also
United States v. Doe*, 871 F.2d 1248, 1255 & n.2 (5th Cir. 1989) ("[T]he degree of [hearsay]
derivation only affects its persuasive power, not its use at the hearing."). Although hearsay is
admissible, the preferred practice is for the government to present its case through witnesses
where possible, such as investigating agents, juvenile probation officers, and school officials.
*See, e.g.*, *United States v. D.R.*, 225 F. Supp. 2d 694, 695–96 (E.D. Va. 2002).

Should a court grant a motion for permissible transfer, a juvenile may file an
interlocutory appeal under the collateral order rule. *In re Sealed Case*, 893 F.2d at 367–68.

19

**B. Legal Standard—Permissive Transfer**

While most criminal acts committed by young persons are addressed by state law,
usually in the context of a delinquency proceeding, the FJDA explicitly provides for federal
jurisdiction over allegedly delinquent juveniles in certain situations. The FJDA defines a
"juvenile" as a person who has not yet attained his eighteenth birthday. 18 U.S.C. § 5031.
"Juvenile delinquency," per the FJDA, is the violation of federal law by a person prior to his
eighteenth birthday if such an act would be a federal crime if committed by an adult. *Id.*

The government must proceed in reference to an act of juvenile delinquency in
juvenile delinquency proceedings pursuant to the FJDA unless transfer to adult criminal
prosecution is authorized by statute. 18 U.S.C. § 5032 ¶ 4. It is the government's burden to
establish by a preponderance of the evidence that a juvenile should be transferred to adult
criminal prosecution because "there is a presumption in favor of juvenile adjudication." *See*
*United States v. Nelson*, 68 F.3d 583, 588 (2d Cir. 1995) (citing *United States v. A.R.*, 38 F.3d
699, 706 (3d Cir. 1994)).

The government may pursue adult criminal prosecution if three conditions are
met: (1) The juvenile is "fifteen years and older"; (2) the alleged offense is "committed . . . after
his fifteenth birthday"; (3) the alleged offense, "if committed by an adult[,] would be a felony
that is a crime of violence . . . ." 18 U.S.C. § 5032 ¶ 4. Once those conditions are satisfied, the
transfer can only take place if the Court finds, "after [a] hearing, [that] such transfer would be in
the interest of justice." 18 U.S.C. § 5032 ¶ 4. This is essentially "a determination that the risk of
harm posed by that juvenile outweighs the chance for rehabilitation." *United States v. James*,
556 F.3d 1062, 1066 (9th Cir. 2009) (internal citations and quotation marks omitted).

To determine if a transfer is in the interest of justice, the Court must consider and
make a finding on the record as to each of six statutory factors: "[1] the age and social

20

background of the juvenile; [2] the nature of the alleged offense; [3] the extent and nature of the

juvenile's prior delinquency record; [4] the juvenile's present intellectual development and

psychological maturity; [5] the nature of past treatment efforts and the juvenile's response to

such efforts; [and 6] the availability of programs designed to treat the juvenile's behavioral

problems." 18 U.S.C. § 5032 ¶ 5. The Court "is not required . . . to give equal weight to each

factor" and "'may balance them as it deems appropriate.'" *United States v. McQuade Q.*, 403

F.3d 717, 719 (10th Cir. 2005) (quoting *United States v. Leon, D.M.*, 132 F.3d 583, 589 (10th

Cir. 1997)). Under D.C. Circuit precedent, a court must make specific findings on each factor

and consider only subjects authorized by statute. *See In re Sealed Case*, 893 F.2d at 368–69

("Obviously, Congress was concerned with limiting the kind of information that comes before a

judge at a transfer hearing. That is why it went into such detail . . . ."); *see also United States v.

Juvenile Male*, 492 F.3d 1046, 1049 (9th Cir. 2007) (concluding that district court committed

clear error in, *inter alia*, making comparison that "was not based on information in the record

and did not assist in the individualized assessment of the juvenile's unique circumstances"). *But

see United States v. Male Juvenile E.L.C.*, 396 F.3d 458, 462–63 (1st Cir. 2005) ("[S]ection

5032's requirement that mentation be given to all six named transfer factors, does not preclude

the district court from considering other unnamed factors that are relevant to the determination of

whether the juvenile's transfer would be in 'the interest of justice.'"). Courts have provided

interpretive glosses for some of the factors, as discussed below.

### C. Analysis

The Court finds that the three preconditions to permissive transfer set forth in 18

U.S.C. § 5032 ¶ 4 are met. Y.A. is over the age of fifteen, and the alleged offenses were

committed when he was seventeen. The offenses with which he is charged—RICO conspiracy,

VICAR, and first-degree murder while armed—are violent felonies. *See* 18 U.S.C. § 16

21

(defining crime of violence); *United States v. Juvenile Male*, 118 F.3d 1344, 1350 (9th Cir. 1997)

(holding that RICO conspiracy to commit Hobbs Act robbery is a crime of violence within the

meaning of 18 U.S.C. § 5032). Thus, the issue becomes whether transfer to adult criminal

prosecution is in the interest of justice. The Court considers each statutory factor in turn.

## 1. Age and Social Background

"[T]he more mature a juvenile becomes, the harder it becomes to reform the

juvenile's values and behavior." *United States v. H.S., Jr.*, 717 F. Supp. 911, 917 (D.D.C. 1989),

*rev'd on other grounds sub nom. In re Sealed Case (Juvenile Transfer)*, 893 F.2d 363 (D.C. Cir.

1990). A court should consider both the age "at the time of the offense" and "the age at the time

of the transfer motion." *Nelson*, 68 F.3d at 588.

The Court finds that this factor favors transfer because Y.A. was nearly eighteen

at the time of the offenses and because he is now nearly twenty-two years old. Had the alleged

offenses been committed a mere six months later, treatment as an adult would have been

automatic. On the range of ages governed by the FJDA—fifteen to eighteen—Y.A. was much

closer to the higher end than the lower. The Court acknowledges the challenges reflected in

Y.A.'s social background, including being raised in Honduras without much involvement from

his parents, spending limited time with his father, growing up substantially in the care of

relatives after about age six, and having to acclimate to a new country and culture after

immigrating illegally at approximately age fourteen. Nonetheless, Y.A. also had an opportunity

to assimilate to the United States after being reunited with his mother approximately three years

before committing these offenses. The Court concludes that Y.A.'s age at the time of

commission of these offenses, close to being an adult, deserves more weight in the analysis than

the difficulties Y.A. faced in his upbringing. Moreover, given his present age, Y.A. is better

suited to handle the adult criminal prosecution system than, for example, a fifteen year old might be.

### 2. Nature of the Alleged Offense

The Court "is entitled to assume that the juvenile committed the offense charged for the purposes of the transfer hearing." *In re Sealed Case*, 893 F.2d at 368–69. A more serious offense should be weighed more heavily than other factors in the balancing analysis. *United States v. Juvenile Male MC*, 322 F.3d 482, 485 (8th Cir. 2002) (citing *United States v. Ramirez*, 297 F.3d 185, 193 (2d Cir. 2002)). Moreover, the Court "shall consider the extent to which the juvenile played a leadership role in an organization, or otherwise influenced other persons to take part in criminal activities, involving the use or distribution of controlled substances or firearms." 18 U.S.C. § 5032 ¶ 5. "Such a factor, if found to exist, shall weigh in favor of a transfer to adult status, but the absence of this factor shall not preclude such a transfer." *Id.*

The nature of the alleged offenses weighs heavily in favor of transfer. The crimes with which Y.A. is charged are neither victimless nor excusable as youthful indiscretions; they are some of the gravest charges that the United States can bring. Compounding the severity of two murder charges in this case is the fact that they were not isolated crimes of passion; to the contrary, Y.A. did these acts allegedly in concert with others, against strangers, and in furtherance of the activities of MS-13, a notorious and violent gang. The November 6, 2008 murder was allegedly to carry out a "green light" issued by MS-13 leaders, and the victim died after being stabbed over twenty times. Y.A. and other MS-13 members chased the victim of the December 12, 2008 murder, believing him to be a rival gang member; Y.A. stabbed him at least ten times. The government further asserts that Y.A. was one of the leaders of an MS-13 clique, or subgroup. The Court thus finds that the leadership factor is present and weighs in favor of transfer.

23

Little more need be said; these serious and distressing adult crimes, undertaken to

further the violent ends of an infamous criminal organization, militate strongly in favor of

transfer.

### 3. Extent and Nature of Prior Delinquency Record

The Court may not consider criminal activity that takes place *after* the charged

offenses, but such activities can be considered more generally as bearing on the juvenile's

"potential for rehabilitation in the juvenile justice system." *Male Juvenile E.L.C.*, 396 F.3d at

462–63.



this factor also weighs heavily in favor of transfer.

### 4. Present Intellectual Development and Psychological Maturity

In evaluating this factor, courts can consider expert reports and testimony. *E.g.*,

*United States v. Juvenile Male No. 2*, 761 F. Supp. 2d 27, 40–41 (E.D.N.Y. 2011).

The Court finds that this factor is neutral and favors neither transfer nor juvenile treatment. Even assuming *arguendo* that the composite IQ score of 77 reported by Dr. DeClue underreports Y.A.'s intelligence because the IQ test was in English and was conducted over two years ago, there can be no question that Y.A. has limited intellectual capacity. This would, in some circumstances, merit serious pause before granting a transfer to adult criminal prosecution. The parties rely on conflicting evidence in their arguments on this factor. The government notes that Y.A. has earned his GED while incarcerated, while Y.A.'s counsel asserts that Y.A.'s borderline intellectual functioning is evidence that Y.A. was particularly susceptible to the deleterious effects of peer pressure of a gang like MS-13. The other evidence in the record does not tip the scales one way or the other; while Detective Kasul and Agent Brumbelow assert that Y.A. was relatively mature and understanding during their interviews with him, neither testified convincingly that Y.A. was otherwise insightful, articulate, or mature in a way that would belie Dr. DeClue's findings. The Court's independent review of the video of the MPD interrogation of Y.A. is also inconclusive; in 2008, at the time of the interview, Y.A. did not appear impressively mature, but he was not infantile, either.

One part of the record does somewhat blunt concerns about treating Y.A. as an adult: Dr. DeClue's finding that Y.A. was not more susceptible to interrogative suggestibility than the average person. Putting aside general concerns about Y.A.'s intelligence level, this finding by Dr. DeClue is consistent with the other testimony in the record because it shows that Y.A. is capable of understanding his circumstances without being misled.

The Court thus finds that the fourth factor is neutral.

### 5. Nature of Past Treatment Efforts and Response to Such Efforts

The fifth factor weighs in favor of transfer.



        Y.A.'s counsel noted at the transfer hearing that Y.A. has responded well to

incarceration, completing his G.E.D. and tutoring other prisoners. The Court takes this fact into

consideration but finds that it is outweighed by Y.A.'s failures on community supervision.

Moreover, the success Y.A. has experienced in prison is likely as much a result of being

removed from an unsupervised environment to one in which he is at least somewhat free from

the pressures of MS-13. Were he to be out of custody, it is unclear that the result would be the

same because Y.A.'s history demonstrates that even when instructed to refrain from gang

activity as a condition of supervised probation, he has failed to comply.

        The Court thus finds that the fifth factor weighs in favor of transfer.

### 6. Availability of Programs Designed to Treat the Juvenile

        This factor also favors transfer. The parties have stipulated that, because Y.A. is

now almost twenty-two years old, he is not eligible for D.C. juvenile services if released.

Moreover, if Y.A. were subject to juvenile proceedings in federal court and adjudicated

delinquent, he would be ineligible for juvenile services through the federal Bureau of Prisons and

26

would be housed in an adult facility—although he would, of course, be eligible for the full range of treatment programs for adults. Because Y.A. is likely to be deported upon his release from custody, his prospects for probation or supervised release are, likewise, effectively nonexistent.

The lack of viable juvenile treatment options for Y.A. thus counsels in favor of transferring him to adult criminal jurisdiction. Pursuing delinquency proceedings would effectively be a bridge to nowhere—Y.A. would receive no tailored juvenile services and would be treated like other federal adult criminals.

### 7. Balancing of Factors

Having made findings as to each of the six statutory factors, the Court's final task is to balance them to determine whether a transfer to adult criminal prosecution is in the interest of justice. The Court heard argument during the February 7, 2013, hearing, and recounts the parties' positions here.

The government asserts that every factor weighs in favor of transfer and relies most heavily on the nature of the offense, which, it argues, "screams out" for transfer. The Court should not dwell on Y.A.'s difficult upbringing in Honduras, the government contends, because of the overwhelming severity of these charges: Y.A. was allegedly the principal actor in two separate murders within about one month's time, both made to further the goals of MS-13.

Y.A.'s counsel responds that the nature of the offense cannot be the "overriding factor" in Y.A.'s case. The essence of Y.A.'s argument is that the Court must view the charged offenses through the lens of Y.A.'s limited intellectual development and involvement in MS-13, a rigid, hierarchical structure that left him with no option other than to participate in violent offenses. According to Y.A.'s counsel, Y.A.'s developments while incarcerated bear this out: when he is isolated from peer pressure and gang culture, he is more successful.

27

As discussed above and during the hearing, the Court finds that five factors weigh in favor of transfer—some more significantly than others, although none more prominently than the seriousness of the offenses charged. The Court also finds that one factor, present intellectual development and psychological maturity, is neutral. On balance, the interest of justice requires transfer of Y.A. to adult criminal prosecution. There is nothing in Y.A.'s background that would merit treating him as a juvenile except possibly his intelligence level. But in the context of this case, Y.A.'s borderline intellectual functioning does not outweigh all of the other factors and cannot excuse him from facing the potential consequences of involvement in two gang-related murders as an adult.

The Court notes that its ruling is consistent with Y.A.'s treatment in Superior Court and with two recent decisions from the Eastern District of New York. In the federal cases, the court transferred to adult prosecution two juvenile males charged with, *inter alia*, murder in aid of racketeering arising from an MS-13 related double homicide. *See United States v. Juvenile Male*, 754 F. Supp. 2d 569 (E.D.N.Y. 2010); *United States v. Juvenile Male No. 2.*, 761 F. Supp. 2d 27 (E.D.N.Y. 2011). While this case is not identical, those cases, with careful factfinding and analysis, are highly instructive. *E.g.*, *Juvenile Male*, 754 F. Supp. 2d at 578 (noting the juvenile's MS-13 involvement and reasoning that there is "no doubt that the murder of a mother and her young son constitutes the type of 'particularly serious' crime that warrants weighing the nature of the offense more heavily than any of the other factors in the transfer analysis").

Accordingly, the Court finds that the transfer of Y.A. to adult criminal prosecution is in the interest of justice. *See* 18 U.S.C. § 5032 ¶ 4.

28

## III. CONCLUSION

For the reasons set forth above and as discussed at the February 7, 2013, juvenile transfer hearing, the Court grants the Government's Motion for Transfer of Proceedings Against Juvenile to Adult Criminal Prosecution. The Court's ruling was memorialized in an Order dated February 7, 2013, which provided that the case will remain under seal until on or after March 11, 2013. If Y.A. files a timely notice of appeal of the Court's Order, the Order will automatically be stayed and the case will remain under seal pending interlocutory appeal.

DATE: February 11, 2013

/s/
ROSEMARY M. COLLYER
United States District Judge

29